# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

MARK HANNING,          )
                               )
     **Plaintiff,**         )
                               )
     **vs.**             )     **Case number 4:09cv0745 CAS**
                               )              **TCM**
MICHAEL J. ASTRUE,     )
**Commissioner of Social Security,**   )
                               )
     **Defendant.**       )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying Mark

Hanning ("Plaintiff") disability insurance benefits ("DIB") under Title II of the Social Security

Act ("the Act"), 42 U.S.C. § 401-433. Plaintiff has filed a brief in support of his complaint;

the Commissioner has filed a brief in support of his answer. The case was referred to the

undersigned United States Magistrate Judge for a review and recommended disposition

pursuant to 28 U.S.C. § 636(b).

## Procedural History

Plaintiff applied for DIB in August 2006, alleging that he was disabled as of May 18,

2006, because of back problems. (R.[1] at 111-13.) His application was denied initially and

after a hearing held in January 2008 before Administrative Law Judge ("ALJ") James B.

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

Griffith.  (Id. at 5-16, 20-64, 66, 71-76.)  The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel; Karen C. Hanning, his mother; and Jeffrey F. Magrowski, Ph.D., testified at the administrative hearing.  Presented at the hearing was a letter written on Plaintiff's behalf by his sister.

Plaintiff testified that he was born on March 28, 1973.  (Id. at 25.)  He is divorced and lives in a trailer with his mother.  (Id. at 26, 39.)  He has an eight-year old child.  (Id. at 26.)  He has completed one year of college and has had some vocational training as a truck driver.  (Id. at 27.)

Plaintiff was in Iraq as a member of the National Guard in 2005 and 2006.  (Id. at 27.)  He last worked in August 2007 doing drill duty for the National Guard.  (Id.)  He was sent home because he was on medication.  (Id. at 28.)  Between leaving Iraq and August 2007, his only employment had been attending drills two days a month.  (Id. at 27, 30.)

Plaintiff had been a fuel truck driver for the military from March 1993 to May 2006 with the exception of September 2003 to September 2004 when he worked as a propane truck driver delivering propane tanks to households.  (Id. at 31, 33.)

Asked why he is unable to work, Plaintiff replied that his physical and mental conditions make him unsafe to his coworkers.  (Id. at 34.)  The injury from an operation on his back is causing him mental stress.  (Id. at 34-35.)  He has only worked as a truck driver

and would need to retrain for a new career.  (<u>Id.</u> at 35.)  His financial situation prevents him from retraining.  (<u>Id.</u>)

Plaintiff is treated at the Veterans' Administration ("VA") Hospital twice a week for post-traumatic stress disorder ("PTSD") and follow-up from the neurosurgeon.  (<u>Id.</u> at 36, 51.) The treatment includes physical therapy, pain management classes, and vocational rehabilitation.  (<u>Id.</u> at 36.)  The PTSD causes him flashbacks and nightly insomnia.  (<u>Id.</u> at 37.)  Plaintiff is being treated by a neuropsychologist for his difficulties concentrating.  (<u>Id.</u> at 38.)  These difficulties prevent him from focusing on something long enough for him to complete a task.  (<u>Id.</u>)  He can sit and read a book.  (<u>Id.</u> at 40.)  His hobby is playing guitar. (<u>Id.</u> at 41.)

A few months before the hearing, Plaintiff went to the VA Hospital because he had suicidal thoughts.  (<u>Id.</u> at 39.)  He has had two suicidal attempts since returning from Iraq. (<u>Id.</u> at 41, 51.)  He last saw his VA counselor approximately three weeks ago.  (<u>Id.</u> at 43.)  He is taking Cymbalta, an anti-depressant; hydrocodone, a moderate pain reliever; Diazepam, for anxiety; gabapentin, an anticonvulsant and pain reliever; vitamin B1; and folic acid.  (<u>Id.</u> at 44.)  He takes the hydrocodone two to three times a day, depending on his pain.  (<u>Id.</u>)  This amount has not changed since his surgery.  (<u>Id.</u>)  The Diazepam was prescribed a week earlier by an emergency room doctor at St. Anthony's Hospital after Plaintiff went there when experiencing opiate withdrawal symptoms.  (<u>Id.</u>) 45.)

After returning from Iraq, Plaintiff applied for jobs as a truck driver.  (<u>Id.</u> at 40.)  He was not hired, nor was he rehired by his former employer.  (<u>Id.</u>)

He did not anticipate having any problems being retrained or reeducated if he gets the treatment he needs and stops taking narcotic medication. (<u>Id.</u>) He is going to volunteer to participate in drug and alcohol rehabilitation due to the ongoing medication he has been on for nine months. (<u>Id.</u> at 42.) He has not done so before because he has been recovering from surgery. (<u>Id.</u>) He has applied for vocational rehabilitation through the VA and is waiting for a decision. (<u>Id.</u> at 43.)

On a typical day, Plaintiff wakes up, watches television, does the dishes or mops the floor, and lies back down. (<u>Id.</u> at 45-46.) He cooks light meals. (<u>Id.</u> at 46.) The only laundry he does is moving things from the washer to the dryer. (<u>Id.</u>) He does go grocery shopping. (<u>Id.</u>) Plaintiff drives two or three times a week to his sister's house. (<u>Id.</u> at 27, 51.)

Mrs. Hanning, a widow, testified that Plaintiff has been living with her since returning from Iraq. (<u>Id.</u> at 47.) She has noticed that he cannot lift anything heavier than twenty pounds or bend over. (<u>Id.</u> at 48.) He is sometimes distracted and has to have a question repeated. (<u>Id.</u>) He stopped using his computer after his surgery. (<u>Id.</u> at 49.) When he first came home, he would have fits of rage; he has not had them lately. (<u>Id.</u>) He has calmed down due to his medication. (<u>Id.</u>) She confirmed Plaintiff's description of his daily activities. (<u>Id.</u> at 50.) Once every two to three weeks, he visits friends at their houses. (<u>Id.</u>) She has not noticed whether Plaintiff has any difficulties concentrating. (<u>Id.</u> at 52.) She later explained that he would sometimes let his mind wander and did have difficulty focusing. (<u>Id.</u> at 55-56.)

Mrs. Hanning further testified that Plaintiff has lost approximately 20 pounds and weighs about 140. (<u>Id.</u> at 54.) He walks very slowly and sometimes has to hold on to

something.  (Id. at 56.)  He occasionally sways when he walks.  (Id. at 56.)  She sometimes hears him get up at night.  (Id. at 54.)  And, he talks to himself a lot.  (Id. at 54-55.)  He is intoxicated "[m]aybe once a week" when she gets him "a couple beers."  (Id. at 57.)  She does this on days when he is not taking his medication.  (Id. at 58.)

Dr. Magrowski testified as a vocational expert ("VE").  He characterized Plaintiff's work as a soldier as heavy and semiskilled.  (Id. at 59.)  His job as a petroleum supply specialist was medium and skilled.  (Id.)  His work as a fuel delivery driver and as a propane truck driver were each medium and semiskilled.  (Id.)  The ALJ then asked the VE the following question.

> If you were to assume a hypothetical worker able to lift and carry 50 pounds occasionally, 25 pounds frequently, stand and/or walk for up to a total of about six hours in an eight hour day with the normal breaks, sit for a total of up to about six hours in an eight hour day with the normal breaks, who should not lift beyond shoulder level, not engage in climbing ladders or scaffolds, no more than occasionally use ramps or stairs, balance, stoop, kneel, crouch or crawl, and who should avoid concentrated exposure to vibration.  If you were to consider the combined effect of those factors, would any of those past jobs that you've indicated be possible?

(Id. at 59-60.)  The VE answered that they would not.  (Id. at 60.)  Such an individual would, however, be able to do truck driving work at a medium, semiskilled level.  (Id.)  Those jobs existed in excess of 5,000 in the state economy and 500,000 in the national economy.  (Id.)

The ALJ then asked what the effect would be if the above-described hypothetical person could occasionally lift no more than twenty pounds.  (Id.)  The VE replied that there were light truck driving jobs that such a person could perform.  (Id. at 61.)  There were approximately 4,000 of these jobs in the state economy and 200,000 in the national.  (Id.)

The ALJ added a limitation of requiring a job "involving understanding, remembering and following simple instructions and directions in a routine environment." (Id.) Such a person would not be able to perform any of the jobs previously outlined by the VE, but would be able to do simple jobs like light cleaning/housekeeping; laundry worker, domestic type; and mail clerk or mail sorter. (Id.) These jobs also exist in significant numbers in the state and national economies. (Id.) An additional limitation of "no more than occasional contact with the public or coworkers" would not have a significant impact on these jobs. (Id.) Episodes of decompensation lasting five to ten minutes and occurring once of twice a week would have a significant impact on the jobs. (Id. at 62.) The need to lie down for thirty minutes every two hours of every day would eliminate any regular jobs. (Id.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his application, records from various health care providers, and the report of a non-examining consultant.

When applying for DIB, Plaintiff completed a Function Report. (Id. at 136-43.) He explained that he could not sleep because of discomfort. (Id. at 137.) His impairments made it hard for him to bend over to dress, shower, and drive trucks. (Id.) They also affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks. (Id. at 141.) He had a loss of appetite. (Id. at 137.) Medication did not help. (Id. at 138.) He occasionally mowed the lawn, but it took twice as long as before. (Id.) His mother did the housework. (Id. at 139.) His hobbies included making arrowheads, going to flea markets, and

playing the keyboard.  (Id. at 140.)  He could walk for only 200 yards before having to stop and rest for five minutes.  (Id. at 141.)  He could pay attention for 90% of the time and he finished what he started.  (Id.)  He followed written instructions well.  (Id.)  He was impatient with "dumb" people and disliked drama.  (Id. at 142.)  He quit his job driving the propane truck when he did not get a raise.  (Id.)  He had insomnia and was afraid of remaining unemployed or of working in a low-paying job.  (Id.)  His impairments prevented him from working at the jobs he used to do and, until he completed his career training, he could not perform any other "blue-collar" jobs.  (Id. at 143.)

Plaintiff also completed a Disability Report.  (Id. at 151-58.)  He listed his height as 5 feet 11 inches tall and his weight as 155 pounds.  (Id. at 151.)  Back problems limited his ability to work. (Id. at 152.)  Specifically, he could not lift over 50 pounds, drive a truck, and stand for long without getting dizzy.  (Id.)  Also, his right arm became numb and he was having a little difficulty breathing.  (Id.)  His impairments first bothered him in 2000 and stopped him from working on May 18, 2006 – the day he was discharged from active duty.[2] (Id.)  The job he had held the longest was as a petroleum supply specialist for the military. (Id. at 153.)  This job required that he occasionally lift 100 pounds or more and frequently lift 50 pounds or more.  (Id.)  He had to walk and stand for 5.5 hours and climb, stoop, kneel, and crouch for 6 hours.  (Id.)  He had supervised five people.  (Id.)  His current medication

---

[2]Plaintiff received an honorable discharged from active duty.  (Id. at 134-35, 144-45.)

included only Motrin; there were no side effects. (Id. at 155.) His current physician was Ravi Shitut, M.D. (Id. at 154.) He had first seen Dr. Shitut in June 2006. (Id.)

After the initial denial of his applications, Plaintiff completed a Disability Report – Appeal form. (Id. at 91-95.) He reported that there had been no change in his condition and no new limitations, injuries, or illnesses since October 2006. (Id.)

Plaintiff had reported earnings in 1990 and between 1993 and 2006, inclusive. (Id. at 116.)

The relevant medical records before the ALJ are summarized below in chronological order.

Plaintiff first saw Dr. Shitut on May 23, 2006, for his thoracolumbar pain. (Id. at 184-83.) He reported that the pain had been bothering him for six months. (Id. at 184.) On examination, he had a normal gait, could walk on his tiptoes and heels without difficulty, and had a satisfactory range of motion. (Id. at 183.) Straight leg raising sign[3] was negative bilaterally. (Id.) He had no obvious atrophy. (Id.) He was tender at the thoracolumbar junction, but the tenderness was axial and non-radicular. (Id.) He was scheduled for a magnetic resonance imaging scan ("MRI") and started on physical therapy and Naprosyn, a nonsteroidal anti-inflammatory. (Id.) The diagnosis was myofascial thoracolumbar pain. (Id.) Degenerative disc disease was to be ruled out. (Id.) An MRI revealed a large central

---

[3]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended." **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

and right parasagittal soft disc protrusion at L2-L3 and a smaller L5-S1 central disc protrusion. (Id. at 185.) When he saw Plaintiff in June, Dr. Shitut ruled out a simple discectomy but noted that, if surgery was necessary, a discectomy and fusion might be appropriate. (Id. at 183.) Plaintiff was to continue as is and, if his symptoms justified it, consider surgery in two months. (Id.) The diagnosis was large herniation of L2-L3 disc with axial symptoms. (Id.) On July 3, Plaintiff telephoned Dr. Shitut and reported having some discomfort. (Id. at 182.) He was to take ibuprofen twice a day at meals and to call back if that provided no relief. (Id.) He saw Dr. Shitut on July 21, at which time the MRI findings were discussed. (Id.) Dr. Shitut expressed concern that Plaintiff was working two truck driving jobs. (Id.) He encouraged Plaintiff to do only driving, and not loading and unloading, if he insisted on working as a truck driver. (Id.) Plaintiff's treatment of pain relief and muscle relaxation was continued. (Id.) He was given Ultracet, a pain reliever, and was to return in four to six weeks. (Id.) Four days later, Plaintiff telephoned for a return-to-work note outlining the lifting restrictions. (Id.) One was given. (Id.)

With the exception of an emergency room visit to St. Anthony's Medical Center, the remaining medical records are from the VA Medical Center and health care providers on staff there.

On January 3, 2007, Plaintiff went to the VA Medical Clinic to transfer his care, get medication, and have his back problems treated. (Id. at 308-15, 342-54.) It was noted that he had been drinking heavily since Iraq. (Id. at 309, 343.) He screened positive for depression and PTSD. (Id. at 314, 345.) He reported loss of interest or pleasure in activities,

disturbed sleep, fatigue, feelings of worthlessness or guilt, and problems concentrating.  (Id. at 240.)  He was interested in medication and psychotherapy.  (Id.)  He was referred to a psychiatrist.  (Id.)

Plaintiff was evaluated by a physical therapist on January 10.  (Id. at 236-38, 306-08, 340-42.)  He described his low back pain as constant and dull.  (Id. at 236, 306, 340.)  Pain medication did not help.  (Id.)  On a scale of one to ten, his pain was a five.  (Id.)  The pain was aggravated by prolonged sitting or standing.  (Id. at 236, 307, 340.)  On examination, he had no change in pain when bending to touch his toes, but did have an increase in pain when bending to the side or to the back.  (Id. at 237, 307, 341.)  He had a normal range of motion in his knees and when rotating his hips, but had an increase in pain when flexing his spine.  (Id.)  Plaintiff was given some home exercises and was to return in one week.  (Id. at 238, 308, 342.)  He cancelled that appointment.  (Id. at 306, 339-40.)

A January 31 notation from a social worker with the substance abuse clinic reads that Plaintiff had reported that his primary focus was on treatment for his back pain.  (Id. at 239, 305, 339.)  Because of his pain medication and his anticipated surgery, he had "seriously cut back on his drinking" and had one or two beers a week.  (Id.)

On February 6, Plaintiff was seen by Fred Metzger, Ph.D.  (Id. at 241-46, 299-305, 333-38.)  Plaintiff had a normal gait, but displayed some pain behaviors during the interview.  (Id. at 242, 300, 334.)  His affect was tearful; his mood was depressed and anxious.  (Id.)  His judgment appeared intact; no perceptual disturbances were noted.  (Id.)  He was cooperative and easy to engage, but difficult to focus.  (Id.)  The results of various tests were as follows.

On a test designed to assess a patient's perceived level of disability and functional disruption due to pain, the Pain Disability Index, Plaintiff scored a 41/70, "indicating a high degree of perceived disability relative to other pain patients." (<u>Id.</u> at 242, 301, 334-35.) On a test designed to assess a patient's fear of physical movement and activity, the Tampa Scale for Kinesiophobia, he scored 36/48, "indicating a high degree of fear of physical movement and activity." (<u>Id.</u> at 242, 301, 335) On a test designed to assess a patient's cognitive and emotional reactions to intense pain, the Pain Catastrophizing Scale, he scored 49/52, "indicating a high degree of catastrophic thinking." (<u>Id.</u> at 243, 301, 335.) On a test "designed to predict aberrant medication related behavior," the Pain Screener and Opioid Assessment for Patients with Pain, Plaintiff scored 31/66, indicating a high risk for such behavior. (<u>Id.</u> at 244, 302, 336.) Plaintiff reported that he only performed the physical therapy exercises sporadically. (<u>Id.</u> at 243, 301, 335.) He also reported that he had received counseling for alcohol use when in the service and had admitted himself into a treatment center for a few days the previous November. (<u>Id.</u> at 244, 302, 336.) He attributed his depression and difficulties concentrating to his back pain and his anxiety to problems adapting to civilian life. (<u>Id.</u>) He had difficulty going to sleep and staying asleep. (<u>Id.</u>) He had nightmares once a week from his combat experience and witnessing a soldier commit suicide. (<u>Id.</u>) He did not have actual flashbacks, but certain smells triggered intense memories of Iraq and feelings of paranoia. (<u>Id.</u>) His one episode of suicidal ideation followed a period of heavy drinking. (<u>Id.</u> at 244, 302-03, 336.) When he first returned from Iraq, he drank six to twelve beers a day, escalating to twelve beers and a fifth of hard liquor. (<u>Id.</u> at 244, 303,

337.) He initially reported that he had stopped drinking after his inpatient treatment, but later admitted to drinking a fifth of hard liquor the night before. (Id.) Dr. Metzger noted that Plaintiff appeared to minimize his alcohol use and that Plaintiff's former wife had refused to allow him to see his son until he entered a treatment program. (Id. at 244-45, 303, 337.) Dr. Metzger's diagnosis was alcohol dependence, PTSD, and pain disorder. (Id. at 245, 303, 337.) He assessed Plaintiff's current Global Assessment of Functioning[4] ("GAF") as 50.[5] (Id. at 245, 304, 337.) He concluded that Plaintiff's use of alcohol, his "poorly controlled psychiatric condition," and his apparent use of multiple community providers, e.g., emergency room visits,[6] placed him at a high risk for aberrant use of opioids. (Id. at 246, 304, 338.) Dr. Metzger thought Plaintiff's depressive symptoms were secondary, noting that although Plaintiff described his mood as depressed, he maintained interest in activities. (Id. at 338.) Dr. Metzger recommended a substance abuse treatment program; Plaintiff declined, explaining that his alcohol use did not warrant such participation. (Id. at 246, 304, 338.) Dr.

---

[4]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000), the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003); accord **Juszczyk v. Astrue**, 542 F.3d 626, 628 n.2 (8th Cir. 2008).

[5]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic Manual at 34.

[6]Plaintiff had not been able to give a coherent history of his prescription medication use, reported that he did not have a primary care physician, and explained that his medications were prescribed by various emergency room doctors. (Id. at 243.)

Metzger also recommended a PTSD program; Plaintiff accepted.  (Id.)  Dr. Metzger recommended against use of opioids.  (Id.)

Plaintiff was seen by James W. Cannon, M.D., a psychiatrist, on February 15 for evaluation of his PTSD and his alcohol dependence.  (Id. at 230-32, 295-97, 329-31.)  His symptoms included nightmares, intrusive thoughts, avoiding reminders, difficulty concentrating and sleeping, anger, depression, and anxiety.  (Id. at 231.)  He reported that he had not been drinking for the past three to four weeks and was hearing voices and having minor visual hallucinations.  (Id. at 296, 330.)  His father had had severe alcoholism and his mother had nervous breakdowns.  (Id.)

Six days later, he saw another social worker, Christina Fagan, MSW, LCSW.  (Id. at 293-94, 327.)  He was eating and sleeping better, but was still concerned about his lack of finances.  (Id. at 294, 327.)

On February 26, Plaintiff saw Ms. Fagan and a neurosurgeon, Kevin Smith, M.D.[7]  (Id. at 232-34, 283, 291-93, 324, 326-27.)  Ms. Fagan described him as stable.  (Id. at 291, 324.)  Plaintiff consulted Dr. Smith about his low back and bilateral leg pain.  (Id. at 232-34, 283, 326-27.)  He explained that he had been having the pain for the past seven months after being bounced around in a truck in Iraq when wearing a 100-pound combat jacket.  (Id. at 232.)  His private physician had recommended surgery, but Plaintiff had lost his private insurance.  (Id.)  Dr. Smith agreed that Plaintiff needed surgery.  (Id. at 234.)  A chest x-ray taken that day was

[7]In his brief, Plaintiff appears to mistakenly refer to this meeting as having occurred on *October* 26, 2007.

normal.  (<u>Id.</u> at 201, 356-57, 464.)  An MRI taken a few days later of Plaintiff's spine revealed mild degenerative disc disease at L5-S1, a large right paracentral disc herniation at L2-L3, and a mild right paracentral disc bulge with mild compression of the anterior aspect of the thecal sac at L4-L and at L5-S1.  (<u>Id.</u> at 200-01, 355-56, 463-64.)

Plaintiff saw Ms. Fagan on March 5 and again on March 19.  (<u>Id.</u> at 290-91, 323.)  At the earlier meeting, he reported that he had drunk one beer with a friend a few nights earlier.  (<u>Id.</u> at 290, 323.)

Plaintiff saw a neurosurgeon, John Cantando, D.O., on April 3.  (<u>Id.</u> at 286-87, 288.)  He reported increasing pain and lower extremity numbness and tingling, especially with walking.  (<u>Id.</u> at 286.)  His legs gave out when walking and he was feeling weak.  (<u>Id.</u>)  It was noted that he was able to walk without any assistance and that, with the exception of some proximal weakness in his left leg, he had 5 out of 5 strength in his legs.  (<u>Id.</u>)  Dr. Cantando recommended surgery, including a L2-L3 laminectomy with disc incision.  (<u>Id.</u> at 287.)  Plaintiff agreed.  (<u>Id.</u>)  He was prescribed Vicodin, a pain reliever including hydrocodone, a narcotic, and cautioned not to take it with alcohol.  (<u>Id.</u> at 288.)  It was hoped that the prescription would last until the surgery.  (<u>Id.</u>)

Plaintiff informed Ms. Fagan when he saw her on April 4 that his father had died recently, that he knew he had to stay away from alcohol, and that he was frustrated with his financial situation.  (<u>Id.</u> at 287-88.)  He questioned whether anyone would hire him to work in an office and expressed a desire to work as a park ranger.  (<u>Id.</u> at 288.)

Plaintiff went to the emergency room on April 28 to request a muscle relaxer. (Id. at 281-84.) Vicodin made him nervous and sweaty and did not relieve the pain. (Id. at 281.) His pain was a four on a ten-point scale. (Id.) On examination, he had a normal gait, was able to walk on tiptoes and heels without increased pain, could squat, and had appropriate and bilateral muscle strength. (Id. at 282.) He was told to stop the Vicodin and to take Robaxin, a muscle relaxant, every six hours as needed for pain. (Id.) It was noted that his description of his pain corresponded with his non-verbal pain behaviors. (Id. at 283.) Hot baths alleviated the pain. (Id. at 281, 283.)

On May 17, Plaintiff had a lumbar laminectomy at L2 with a microdiscectomy at L2-L3. (Id. at 214-15, 222-30, 253-80, 316-21, 461-62.) There were no complications. (Id. at 214.) The next day, he participated in physical therapy. (Id. at 219, 260.) He had good mobility, but needed assistance in using stairs and used a wheeled walker to walk. (Id.) The therapist opined that he would be safe to return home once medically able. (Id.) Plaintiff informed the consulting nutritionist that he promised himself he would stop drinking after the surgery. (Id. at 261.) The nutritionist opined that Plaintiff was underweight because of his alcohol use; an alcohol abuse class was offered and rejected. (Id. at 262.) Plaintiff was discharged on May 19 with no fever and stable vital signs. (Id. at 214, 253.) He was not to drive for one week and to remain off work for one month. (Id. at 256.) A few days later, he had the surgical staples removed. (Id. at 251.) He reported incisional pain. (Id.) Vicodin made him nauseous; he was prescribed Percocet, a narcotic pain reliever. (Id.) The staples were removed without difficulty. (Id.)

When called on June 4 for a follow-up appointment, his mother reported that Plaintiff had left for New York to visit friends. (Id. at 250.)

On August 29, Plaintiff saw Ms. Fagan. (Id. at 247, 410.) He had recently returned from New York and wanted to reestablish care at the VA. (Id. at 247) He had met a woman there, had fallen in love, and planned to return once his financial situation was resolved and he had a military transfer. (Id.) He had not been "'drinking as much.'" (Id.)

Plaintiff saw a primary care physician, Sridam Maitra, M.D., on September 14, explaining that his current medications, including gabapentin, were not helping and that Vicodin would be "ideal." (Id. at 447-50, 508-11.) With the exception of some proximal weakness in his left leg, he had 5 out of 5 strength in his legs. (Id. at 509.) He was given a prescription for Vicodin. (Id. at 449, 510.) He also reported that VA doctors in New York had recommended a computerized topography ("CT") scan of his head due to his memory loss. (Id.) One was to be scheduled. (Id.) Dr. Maitra wrote a note for Plaintiff explaining that Plaintiff was continuing to have numbness and pain in both legs and was restricted to no running, no pushups or situps, no lifting anything heavier than twenty pounds, no bending over for prolonged periods, and no riding in heavy motor vehicles. (Id. at 510.) These restrictions were to continue for three months, at which time Dr. Maitra would reevaluate Plaintiff. (Id. at 511.)

The same day, he saw Dr. Cannon. (Id. at 410, 450-51, 511-13.) He reported that he was easily upset, moody, suffering from poor sleep, irritable for much of the day, and having

thoughts of Iraq.  (Id. at 451, 512.)  He was drinking less, having had only a few drinks a few times a month.  (Id.)

One week later, Plaintiff requested, and was given, another note from Dr. Maitra explaining that he was unfit for duty for at least three months and would be reevaluated then. (Id. at 445-47, 506-07.)

Concerned about numbness and back pain, Plaintiff saw Dr. Smith on October 2.  (Id. at 444-45, 505-06.)  He was having spasms in his back "with no real neurological deficit." (Id. at 445, 506.)  He was told to get physical therapy and to increase his dosage of gabapentin.  (Id.)  As of October 16, he had not scheduled any physical therapy.  (Id. at 483.)

Plaintiff saw Dr. Cannon on October 9.  (Id. at 442-44, 503-05.)  He had stopped taking the citalopram, an antidepressant, and nortriptyline,[8] another antidepressant, because they made him feel strange.  (Id. at 444, 505.)  He was having only two to three drinks once or twice a week.  (Id.)  The next day, Plaintiff saw Ms. Fagan.  (Id. at 441-42, 502-03.)  He reported that he had left "numerous" messages for the woman in New York and had not heard from her.  (Id. at 442.)  He was experiencing pain and numbness in his lower extremities and was going to ask for a physical therapy referral.  (Id.)  He was to call for the next appointment.[9]  (Id.)

_____

[8]The record reflects that these medications had been prescribed as of September 21.

[9]A telephone call was received a few days later from a woman identifying herself as Plaintiff's mother and saying her son did not have PTSD and did not want to see any psychiatrists.  (Id. at 438, 499.)  She was told her son would have to call.  (Id.)

Plaintiff went to the emergency room at St. Anthony's Medical Center on October 11 with complaints of low back pain and fears of being addicted to pain medications. (<u>Id.</u> at 370-84.) He had run out of Vicodin two days earlier. (<u>Id.</u> at 372.) The initial diagnosis was depression, chronic back pain, and opiate and alcohol abuse. (<u>Id.</u> at 371.) He was treated with medication, referred to a social worker, and discharged within two hours with a diagnosis of substance abuse and depression. (<u>Id.</u> at 371, 376.)

A CT scan of Plaintiff's head done on October 16 was normal. (<u>Id.</u> at 461.)

On October 22, Plaintiff went to the emergency room at the VA with complaints of back pain and diarrhea. (<u>Id.</u> at 433-36, 494-97.) He requested a change in medication and a back brace. (<u>Id.</u> at 434, 497.) Two hours later, he was discharged. (<u>Id.</u> at 359, 433, 494.) A back brace was ordered. (<u>Id.</u> at 359, 481.)

Three days later, Plaintiff was a walk-in to the VA clinic. (<u>Id.</u> at 426-27, 429-32, 490-93.) He had been having persistent muscle spasms in his lumbar area for the past month. (<u>Id.</u> at 429, 490.) Although his back pain had been controlled by Vicodin, the spasms were not. (<u>Id.</u> at 429, 432, 490.) Any activity made the symptoms worse; staying in one position for any length of time caused the spasms. (<u>Id.</u> at 429, 490.) He also reported some mild numbness in his lower extremities since his operation. (<u>Id.</u>) He was prescribed Flexeril, a muscle relaxant, and referred to physical therapy. (<u>Id.</u> at 430, 491.) He was to continue taking Vicodin. (<u>Id.</u> at 430.)

Two weeks later, he went to the VA emergency room having run out of medication and not having yet received medication mailed two days earlier. (<u>Id.</u> at 423-26.) He was alert and

oriented to time, place, and person and had bilateral muscle strength of 5 out of 5.  (Id. at 425.)  The diagnosis was lumbar pain.  (Id.)  He was given two tablets of Vicodin and discharged home with two more.  (Id. at 426.)

On November 1, Plaintiff met again with Ms. Fagan.  (Id. at 422-23.)  Plaintiff reported that he was only drinking a few beers two nights a week.  (Id. at 422.)  He had taken and passed a college entrance exam.  (Id.)  He was described as stable.  (Id. at 423.)

The next day, Plaintiff was admitted to the emergency room with a diagnosis of depression and suicidal ideation.  (Id. at 389-409, 411-22.)  He had become violent after drinking eight beers and taking three Vicodin tablets.  (Id. at 398.)  His GAF on admission was 40.[10]  (Id. at 396.)  He reported that he was having problems taking narcotic pain medication responsibly and with alcohol.  (Id. at 405.)  His relationship with the woman in New York City had ended and he was going through a divorce from his estranged wife.  (Id. at 398-99, 406.)  When sober, he requested he be discharged.  (Id. at 405.)  At discharge, he was prescribed Effexor, an antidepressant, and Neurontin (gabapentin).  (Id. at 393.)  He reported that he planned to return to school soon.  (Id. at 405.)  He was scheduled for neuropsychological testing on November 8.  (Id. at 358, 393.)

Plaintiff saw Dr. Cannon again on November 7.  (Id. at 387-89.)  Plaintiff reported that he had been tapering off Vicodin after his discharge from the hospital.  (Id. at 388.)  He had

---

[10]A GAF between 31 and 40 is indicative of "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ."  Diagnostic Manual at 34.

not used drugs or alcohol since then.  (Id.)  Dr. Cannon prescribed gabapentin and venlafaxine (Effexor).  (Id. at 389.)

Dr. Maitra wrote on January 4, 2008, that Plaintiff was continuing to have numbness and pain in both legs.  (Id. at 456.)  He was restricted to no running, no pushups or situps, no lifting anything heavier than twenty pounds, no bending over for prolonged periods, and no riding in heavy motor vehicles.  (Id.)  These restrictions were to continue for three months, at which time Dr. Maitra would reevaluate Plaintiff.  (Id.)

The neurological testing was rescheduled twice:  first because Plaintiff was neither medically or psychiatrically stable and the second time because he was not psychiatrically stable.  (Id. at 488.)  It was eventually performed on February 23, 2008.  (Id. at 514-20.)  F. Timothy Leonberger, Ph.D., a clinical neuropsychologist, performed the test.  (Id.)  Plaintiff reported that he had left school after the eighth grade, had obtained his General Equivalency Degree ("GED"), and had passed four or five classes at a technical school until enlisting in the military.  (Id. at 515.)  He was in the Army for approximately ten years.  (Id.)  After he was discharged, he drove a propane truck for Amo Gas and enlisted in the National Guard. (Id.)  He was deployed to Iraq in May 2005, where he injured his lower back when the military vehicle in which he was riding suddenly stopped, causing him to be thrown forward. (Id.)  His doctor at St. Anthony's had told him there was a 50% chance he would be paralyzed if he did not have surgery.  (Id.)  He was having digestive and urinary problems that he attributed to his back injury.  (Id.)  Dr. Cantando had performed back surgery in May 2007. (Id.)  He believed he was able to return to light duty work, but had not been released to do so.

(Id.)  Plaintiff further reported that he became "'stressed out, paranoid'" in 2006, was having nightmares about war, was scared to be in large crowds, was having back pain, and was drinking heavily.  (Id.)  He was worried about finances, his son, and his divorce.  (Id.)  He regularly saw a psychiatrist, Dr. Cannon, and a therapist, Ms. Fagan.  (Id. at 515-16.)  He took Vicodin, gabapentin, and Effexor, the latter he took only once every four or five days because it caused fainting spells and headaches.  (Id. at 516.)  He smoked one pack of cigarettes a day and drank six to twelve beers every two weeks.  (Id.)  He liked to walk, "typically for a little over a mile."  (Id.)  He had friends, two of whom he saw on a regular basis.  (Id.)

During the testing process, Plaintiff's level of alertness, attention, and concentration varied.  (Id.)  He reported that he had difficulty sleeping and had slept only one to two hours the night before.  (Id.)  He yawned at times.  (Id.)  His speech was normal in rate, rhythm, tone, articulation, and fluency.  (Id.)  He occasionally paused and mildly stuttered.  (Id.)  His thinking was logical and sequential and displayed no evidence of a thought disorder.  (Id.)  His mood was mildly depressed; his affect was friendly, bright, and appropriate.  (Id.)  His gait was slow and he frequently stretched.  (Id.)  "He appeared to be experiencing a mild level of pain and discomfort in his back."  (Id. at 516-17.)  He reported that he had insomnia and frequently took two to three hours to fall asleep; when he did sleep, he slept for seven to eight hours.  (Id. at 517.)  Pain and discomfort affected his ability to find a sleep position.  (Id.)  "His symptoms of PTSD appear to have waned."  (Id.)  He had had nightmares only once or twice during the past six months.  (Id.)  When discussing them and the deaths of two people he knew, he became emotional.  (Id.)  He was hyperalert in public places and would become

upset when hearing news about Iraq.  (Id.)  The tests results, described below, were "considered to be a mild underestimate of his current neuropsychological functioning."  (Id.)

On testing, Plaintiff had a WAIS-III verbal IQ score of 91, placing him in the average range; a performance IQ score of 74, in the borderline range, and a full scale IQ of 82, in the low average range.  (Id.)  The seventeen-point difference between the verbal and performance was clinically and statistically significant.  (Id.)  "Variability was noted within a number of individual subtests, particularly on measures of attention/concentration."  (Id.)  Plaintiff had scores in the average range on the WAIS-III Working Memory Index and WMS-III Working Memory Index, in the low average range on the WMS-III Immediate Memory Index, and in the borderline range on the General Memory Index.  (Id. at 518.)  His scores on tests measuring psychomotor speed and information processing were "quite variable," ranging from low average to extremely low.  (Id.)  He had a range between low average and average for immediate and delayed recall for measures of visual memory.  (Id. at 519.)  His scores on two tests to measure malingering and deception of memory deficits were within the normal range. (Id.)  Dr. Leonberger concluded as follows.

> This is a very difficult case to analyze.  There is no evidence that [Plaintiff] has ever suffered a head injury that would impair his neuropsychological functioning.  A CT scan . . . was essentially negative. Certainly his poor sleep resulted in fluctuating attention levels during his evaluation.  Also, his medication may have played a part in his less than optimal arousal level.  However, the level of impairment demonstrated by [Plaintiff] on this evaluation appears to go beyond that which would be expected considering the above factors.  He demonstrated significant cognitive problems in the areas of attention/concentration, some auditory memory measures, and psychomotor speed.  His poor performance on subtests measuring visual discrimination and sequencing is also quite troubling. . . .

(Id.) The diagnosis was cognitive disorder, not otherwise specified; PTSD, by history; and alcohol abuse, in early partial remission. (Id.) His GAF was 50.[11] (Id.)

The ALJ also had before him a letter written by Plaintiff's sister and a Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff completed by a non-examining consultant, with the Missouri Section of Disability Determinations in September 2006. (Id. at 190-95.) The latter included only one diagnosis, i.e., degenerative disc disease with herniated disc at L2-L3. (Id. at 190.) This impairment resulted in exertional limitations of Plaintiff being able to occasionally lift or carry fifty pounds; frequently lift or carry twenty pounds; and stand, walk, or sit about six hours in an eight-hour day. (Id. at 191.) His ability to push or pull was unlimited other than these lifting and carrying restrictions. (Id.) He had postural limitations of occasionally avoiding stooping, crouching, crawling, and climbing stairs. (Id. at 193.) He was to avoid climbing ladders, ropes, and scaffolds. (Id.) He had no manipulative, visual, or communicative limitations. (Id. at 193-94.) His only environmental limitation was to avoid concentrated exposure to vibration. (Id. at 194.)

Plaintiff's sister, Angela Howard, wrote that her brother changed after being in Iraq. (Id. at 170-72.) On his return, he was withdrawn and displayed intense pain in his lower back. (Id. at 171.) He was depressed and pessimistic – feelings reinforced by potential employers rejecting him when he failed to pass physicals. (Id.)

### The ALJ's Decision

---

[11]See note 5, supra.

After outlining the Commissioner's five-step sequential evaluation process, the ALJ found at step one that Plaintiff met the requirements for DIB through December 31, 2010, and at step two, that he had not engaged in substantial gainful activity since the alleged onset date. (Id. at 8-10.)  The ALJ next found at step three that Plaintiff had severe impairments of degenerative disc disease, PTSD, and a substance abuse disorder.  (Id. at 10.)  These impairments, singly or in combination, did not meet or medically equal an impairment of listing-level severity.  (Id. at 11.)  Specifically, his mental impairments were not of listing-level severity because they caused only moderate restrictions in his activities of daily living; moderate difficulties in social functioning; mild difficulties in concentration, persistence, or pace; and no episodes of decompensation.  (Id. at 11-12.)

After summarizing Plaintiff's testimony and the medical history, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work[12] except he could not engage in any lifting above shoulder height; could not climb ladders, ropes, or scaffolds; could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl; must avoid concentrated exposure to body vibrations; and was limited to jobs involving simple instructions and directions in a routine setting and with no more than occasional contact with the public and co-workers.  (Id. at 12.)  In reaching this determination, the ALJ considered the testimony of Plaintiff and his mother and noted that Plaintiff had "offered little to no explanation . . . as to why he is unable to engage in the physical requirements of work

_____

[12]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

activity." (Id. at 13.)  Although he had continued to complain of pain since his back surgery, there were no objective findings to support such symptoms.  (Id.)  His daily activities were significant and inconsistent with his described limitations.  (Id.)  The ALJ further noted that the limitations Dr. Maitra had written of in January 2008 were consistent with his RFC assessment.  (Id. at 14.)  Additionally, Plaintiff's statement that he wanted to go back to school was indicative of a belief that he had the mental capacity to concentrate and focus.  (Id.)  Although he had difficulties with sleep and stress associated with his experiences in Iraq, Plaintiff denied having mania, panic attacks, hallucinations, or delusions.  (Id.)  The ALJ also noted that he had considered the written statement of Plaintiff's sister; however, the statement was primarily opinions on medical issues and she was not a qualified medical source.  (Id.)

Addressing Plaintiff's drinking and drug use, the ALJ found that many of his difficulties in life were associated with this abuse and that Plaintiff and his mother appeared to minimize his use of alcohol.  (Id.)  The ALJ concluded that *if* Plaintiff had disabling symptoms affecting his mental state, such symptoms were at least exacerbated by his drinking and drug use.  (Id.)

The ALJ next concluded that Plaintiff was unable to perform his past relevant work. (Id.)  Based on the VE's testimony, Plaintiff, with his age, his education, work experience, and RFC, was able to perform the requirements of such jobs as cleaner, housekeeper, laundry worker, and mail/clerk/sorter.  (Id. at 15.)  Plaintiff was not, therefore, disabled within the meaning of the Act.  (Id. at 15-16.)

## Additional Medical Records Before the Appeals Council

Plaintiff submitted additional medical records to the Appeals Council after the ALJ rendered his decision. These records are summarized below.[13]

A chest x-ray taken on December 31, 2007, when Plaintiff complained of sinus problems and chest congestion for the past four days, showed no acute cardiopulmonary abnormality. (Id. at 531, 881-82.) He was told to stop smoking. (Id. at 881.)

Plaintiff consulted the VA on February 6 about participating in a residential substance abuse treatment program. (Id. at 600-01.) His current substance use included opiates, alcohol, and Valium. (Id. at 600.) He had run out of Vicodin the week before and Valium two days earlier. (Id.) He was drinking approximately a fifth of whiskey plus twelve beers a week. (Id.) He was unemployed, had applied for DIB, and had applied for increased compensation due to PTSD and the increased severity of his back injury. (Id.) He wanted to wait until after February 28 to be admitted to the program because he had a neurology appointment he did not want to miss. (Id.) He was tentatively placed on the wait list and advised to speak to a health care provider to determine his need for detoxification – he did not think it was necessary. (Id. at 601.)

Plaintiff was examined by Dr. Matthew McCall on February 28. (Id. at 862-63.) Plaintiff reported that he had less back pain but continued to have digestion problems and insomnia. (Id. at 862.) He had back pain if he drove for longer than fifteen minutes or walked for longer than one-half mile. (Id.) He had flare-ups of pain several times a day;

---

[13]Only those records that were not previously before the ALJ are discussed.

these flare-ups were a six on a ten-point scale. (Id.) His medications included gabapentin, Naprosyn, and a muscle relaxant. (Id.) On examination, he had moderate discomfort on palpation of the lumbar spine musculature, increased tension over the lumbar musculature, and an ability to forward flex at the lumbar spine to seventy degrees, backward extend to thirty degrees, and rotate to thirty degrees. (Id.) Although pain increased with repetitive range of motion, the range did not decrease. (Id.)

Also in February, Plaintiff was evaluated by a psychologist, Carmen Quenzer, in connection with his appeal from a finding that his PTSD was not service-based. (Id. at 863-68.) It was noted that Plaintiff had last been examined in May 2007 and found to have a GAF of 75.[14] (Id. at 864.) He did not meet the diagnostic criteria for PTSD. (Id. at 865, 866-67.) He stated that he would be happy if he had a job and that he was anxious about changing careers. (Id. at 865.) His constant pain was a six to eight on a ten-point scale. (Id.) He did not take a sleeping medication because it made him feel hung-over. (Id.) On examination, his attention, concentration, immediate memory, impulse control, and verbal abstract reasoning skills were good. (Id. at 867.) His intermediate and delayed memory was poor. (Id.) The diagnosis was adjustment disorder with mixed anxiety and depressed mood and alcohol abuse. (Id. at 868.) His GAF was 72. (Id.)

---

[14]A GAF between 71 and 80 is described as "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors . . . ; no more than slight impairment in social, occupational, or school functioning . . . ." Diagnostic Manual at 34.

At Plaintiff's request, Dr. Maitra wrote the Missouri Department of Social Services in April that Plaintiff's chronic low back pain had recently worsened and he was unable work or to look for work.  (Id. at 856-57.)

An MRI on May 19 of Plaintiff's lumbar spine showed straightening of the upper lumbar spine; mild degenerative disc disease at L2-L3; bulging discs at L2-L3, L4-L5, and L5-S1 with annular tears at L4-L5 and L5-S1; superimposed small central disc herniation at L4-L5 and posterior disc protrusion at L5-S1; and narrowing of the spinal canal and neural foramina.  (Id. at 528-30.)

Plaintiff consulted a VA neurosurgeon, David C. Crafts, M.D., on June 27 about his low back pain.  (Id. at 849.)  His lower extremity pain was gone, but his back pain was not.  (Id.)  This pain was aggravated by exertion and lying down.  (Id.)  He had not participated in any physical therapy.  (Id.)  The degree of bulges in his discs was not impressive, though it was more than expected for someone of his age.  (Id.)  Dr. Crafts recommended that Plaintiff try physical therapy, take Valium, and avoid sitting slumped.  (Id.)

Plaintiff saw Dr. Maitra on August 26.  (Id. at 838-42.)  He reported that he still had back pain, stiffness, and left leg numbness.  (Id. at 838.)  He wanted a muscle relaxant.  (Id.)

Plaintiff was admitted to the VA Hospital after going to the emergency room on September 2 with complaints that his current medication was not relieving his pain.  (Id. at 549-556, 586-87, 783-838.)  He reported that he was receiving 20% disability from the VA but felt he should be receiving 100%.  (Id. at 553, 813.)  Civilian employers would not hire him as soon as they heard about his back.  (Id.)  He was angry, irritable, and, at times,

depressed.  (Id.)  He had difficulty sleeping when thinking of his injuries and his current situation.  (Id.)  On examination, he was oriented to time, person, and place and had a normal thought process and ability to concentrate.  (Id. at 555.)  He was frustrated and his affect began as depressed and changed to animated and euthymic.  (Id.)  On admission, he wanted to wean himself off the Vicodin, Valium, and Flexeril.  (Id. at 556.)  He explained that he had used alcohol recently when he had run out of Vicodin.  (Id. at 799.)  He appeared to have no deficits in attention, concentration, or long-term memory.  (Id.)  He was started on amitriptyline.  (Id. at 556.)  A chest x-ray showed no active pulmonary disease.  (Id. at 528.)  Over the course of two days, his mood improved.  (Id. at 556, 797.)  He was approved for placement in a substance abuse treatment program, but elected to go home despite being advised that he would then be at risk for a relapse of substance abuse/dependence.  (Id. at 556.)  He expressed concern that participation in such a program would harm his chances of obtaining disability or a discharge from the military.  (Id. at 789.)  He signed out on September 5 against medical advice.  (Id. at 556, 784)  The discharge diagnosis was opioid abuse, alcohol abuse, and adjustment disorder, chronic, with mixed anxiety and depressed mood.  (Id. at 552.)  His GAF was 40.[15]  (Id.)

On the day he was discharged, he had a physical therapy consultation.  (Id. at 552, 580-84.)  He described his back pain as sharp, dull, achy, and a ten on a ten-point scale.  (Id. at 581.)  It was aggravated by any activity and relieved by medication and moving.  (Id.)  He

_____

[15]See note 9, supra.

had numbness in his legs.  (Id.)  After one session, the pain was a zero.  (Id. at 583.)  Another session was scheduled for September 9.  (Id. at 584.)

On September 11, his GAF was 50.  (Id. at 752.)

On September 22, Plaintiff cancelled his admission to the residential substance abuse treatment program.  (Id. at 775.)

Plaintiff was admitted to the VA psychiatric ward on September 23 for PTSD.  (Id. at 746-68.)  His medical history also included depression, alcohol dependency, low back pain, and Vicodin abuse.  (Id. at 746, 768, 771, 773.)  He attributed his lack of appetite to his smoking one and one-half pack of cigarettes a day.  (Id. at 746.)  He reported that he had been doing okay for a few days after leaving the hospital, but then had started drinking.  (Id. at 749.)  He was having mood swings, severe nightmares, and flashbacks and was mad at the world and paranoid.  (Id. at 753, 768.)  The next day, his GAF was 40.  (Id. at 754.)  Two days later, Plaintiff was provided with a TENS unit for back pain.  (Id. at 575-76, 737, 738.)  He later reported that the TENS unit had made a big difference in his pain.  (Id. at 728.)  Plaintiff also reported that he had written a ten-chapter book about his time in Iraq.  (Id. at 739.)

Plaintiff was discharged on September 30 and approved for placement in a substance abuse treatment program, depending on bed availability.  (Id. at 547, 577-79.)  He stated that he was ready to stop using "his drug of choice, crack cocaine, as well as alcohol."  (Id. at 578.)  Plaintiff reported that he had been okay for a few days after he left the hospital against medical advice, but then had started drinking again and regretted his departure.  (Id. at 547.)

His GAF was 50.[16]  (Id.)  He also reported that the TENS unit was providing him relief from his low back pain.  (Id. at 724.)

Plaintiff participated in a substance abuse treatment program from September 30 to October 14 and participated in various therapy groups, including those on depression, alcoholism, addiction, stress management, co-dependency, and communication.  (Id. at 642-727.)

Plaintiff saw Ms. Fagan on October 20, without an appointment, reporting that he was overwhelmed by the amount of paperwork, the 20% service-connected disability he was receiving was inadequate to live on, and living with his mother was stressful.  (Id. at 640-41.)  One week later, he told Dr. Cannon that he was tolerating the nortriptyline well but the dosage was insufficient for sleep and that he was trying to increase his physical activities.  (Id. at 631-35.)  His mood was anxious.  (Id. at 633.)  He saw Dr. Maitra the same day.  (Id. at 635-40.)  He was to be referred to the pain management clinic.  (Id. at 637.)

A November 4 notation in Plaintiff's VA medical records reads that Ms. Hanning "has been adamant about [Plaintiff] being unemployable and the focus of the family is to obtain disability."  (Id. at 629.)

On November 5 and again on December 8, Plaintiff had a foramen epidural at St. John's Pain Clinic, done at the VA's expense.  (Id. at 564-68.)

---

[16]Another record lists the GAF as 55.  (Id. at 725.)

Plaintiff saw Dr. Cannon on November 17. (Id. at 619-23.) He was alert and oriented to time, person, and place and had good concentration. (Id. at 622.) He felt depressed, but not suicidal. (Id.) His medication was changed to a renewed prescription for gabapentin and a new prescription for fluoxetine. (Id.) He spoke to Ms. Fagan the next day about an increase in irritability and anxiety. (Id. at 623-24.)

On November 20, Plaintiff's mother called for a prescription for pain medication to be picked up the next day. (Id. at 617.) Dr. Maitra declined, explaining that Plaintiff had made it clear that he did not want to take narcotic pain medications. (Id.) He noted that Plaintiff's mother was either unaware of this preference or had some other interest in the medication because she kept calling. (Id.)

Ms. Fagan counseled Plaintiff on December 2 about advocating for himself in the context of his claim for retirement and service-connected disability. (Id. at 611-12.)

The next day, Plaintiff saw Dr. Maitra for a follow-up appointment for his back, opioid and alcohol dependence, and PTSD. (Id. at 608-11.) His pain was worse since he had stopped taking pain medication. (Id. at 608.) He reported that the epidural had improved his back pain but had caused the pain to radiate to his right leg. (Id.) He had been sober for two weeks. (Id.) He had been evaluated in New York in 2006 for a traumatic brain injury and would like to be reevaluated. (Id.) He was advised to complete the series of three epidurals and was prescribed Ambien for his insomnia. (Id. at 610.) He did not want to participate in a substance abuse treatment program. (Id.) He was encouraged to stop smoking, but did not want to. (Id.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a

minimal impact on [his] ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a

sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." **Wagner**, 499 F.3d at 851 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). "Past relevant work" is "[w]ork the claimant has already been able to do" and has been "done within the last 15 years, lasted long enough for him or her to learn to do it, and was substantial gainful activity." 20 C.F.R.

§ 220.130(a). "[A]n ALJ must make explicit findings on the demands of the claimant's past relevant work." **Zeiler v. Barnhart**, 384 F.3d 932, 936 (8th Cir. 2004).

The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; <u>accord</u> **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). <u>See</u> <u>also</u> 20 C.F.R. § 404.1520(f). The Commissioner may meet his burden by eliciting testimony by a vocational expert, **Pearsall**, 274 F.3d at 1219, or "[i]f [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment," **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001). "However, when a claimant is limited by a nonexertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a

determination of no disability." **Id.**; accord **Baker v. Barnhart**, 457 F.3d 882, 894-95 (8th Cir. 2006); **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999). The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008)

(the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ failed to (1) accurately assess his RFC; (2) accurately assess his credibility; and (3) pose a properly-inclusive hypothetical question to the VE.

As noted above, Plaintiff has the burden at step four of establishing his RFC.  See **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004).  On the other hand, the ALJ has the responsibility of assessing that RFC based on all the relevant evidence, including "at least some supporting [medical] evidence from a professional."  **Id.** at 738.

In the instant case, the ALJ determined that Plaintiff had the RFC to do light work, i.e., to lift no more than 20 pounds at a time and to frequently lift or carry no more than 10 pounds, but could not engage in any lifting above shoulder height; could not climb ladders, ropes, or scaffolds; could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl; must avoid concentrated exposure to body vibrations; and could only work at a job involving simple instructions and directions in a routine setting and with no more than occasional contact with the public and co-workers.  This RFC was consistent with the limitations found by Plaintiff's treating physician, Dr. Maitra, in January 2008, i.e., that he was restricted to no running, no pushups or situps, no lifting anything heavier than twenty pounds, no bending over for prolonged periods, and no riding in heavy motor vehicles.  With this RFC, according to the VE, Plaintiff could perform certain jobs, e.g., laundry worker or mail clerk, that existed in significant numbers in the state and national economies.

Plaintiff argues that the ALJ's assessment of his RFC fatally overlooks the MRIs showing disc herniations consistent with a disabling level of pain and reports indicating that he has a significant mental restriction that is not accommodated by the restrictions of simple instructions or directions in a routine setting and no more than occasional contact with the public or coworkers. In support of this argument, he cites an August 2007[17] scheduled CT scan of his head to investigate short-term memory loss and shooting pains, September 2007 prescriptions for Vicodin and finding he was unfit for duty, October 2007 visit to Dr. Smith with complaints of back pain, spasms, and numbness and his recommendation that Plaintiff see pain management if such symptoms continued, and the May 2008 MRI. For the reasons set forth below, Plaintiff's citations are unavailing.

Plaintiff underwent back surgery in May 2007. When called the following month to schedule a follow-up appointment, he was in New York visiting a woman he had met over the Internet. In September, he saw his treating physician, Dr. Maitra, whom he told the VA doctors in New York wanted to schedule him for a CT scan due to his memory loss. Dr. Maitra did not report or observe such a loss, nor was it Dr. Maitra's idea to have the CT scan done. When it was done the following month, the results were normal. Subsequent neuropsychological testing did not substantiate Plaintiff's claims of memory loss. Indeed, he later reported that he had written ten chapters of a book on his experiences in Iraq.

---

[17]The record reflects that the discussion of a CT scan was in September 2007. For most of the summer of 2007, Plaintiff was apparently in New York.

It was at Plaintiff's requests that he was prescribed Vicodin and given a note that he was unfit for duty. His dependence on Vicodin was later questioned, and he was referred to a substance abuse treatment program on more than one occasion. The unfit-for-duty note was for three months.

When Plaintiff saw Dr. Smith on October 2, he reported numbness, back pain, and spasms. He was told to get physical therapy. He did not. At the end of the month, he informed the practitioners at the VA clinic that his back pain was controlled by medication. When he saw Dr. Maitra the following January, he did not mention back pain, but complained instead of leg pain and numbness. Dr. Maitra imposed certain restrictions on him, restrictions that do not conflict with the ALJ's RFC, but limited those restrictions to a three-month period. As noted above, see note 7, supra, the citation to Dr. Smith's observation that Plaintiff needed surgery erroneously places the visit five months after the May 2007 surgery when it was two months prior.

And, the May 2008 MRI reports were not before the ALJ.

Plaintiff further argues that the ALJ erred in his RFC because he did not follow the Commissioner's regulations on assessing the role substance abuse plays in a claimant's mental impairments.

The ALJ found that Plaintiff's mental impairments were not of listing-level severity because they caused only moderate restrictions in his activities of daily living; moderate difficulties in social functioning; mild difficulties in concentration, persistence, or pace; and no episodes of decompensation. The ALJ further concluded that *if* Plaintiff had disabling

symptoms affecting his mental state, such symptoms were at least exacerbated by his drinking and drug use.

"An individual shall not be considered to be disabled for purposes of [DIB] if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."  42 U.S.C. § 423(d)(2)(C).  When determining whether alcoholism or drug addiction is a key factor, the ALJ is to decide which of a claimant's current physical and mental limitations, upon which the ALJ based his current disability determination, would remain if such abuse stopped and whether those remaining limitations would be disabling.  20 C.F.R. § 404.1535(b)(2).  Thus, an ALJ need *not* evaluate the affect of a claimant's substance abuse on his or her physical and mental limitations if those limitations were not found first to be disabling.  The ALJ did not find Plaintiff's limitations to be disabling; consequently, he did not need to determine the effect of Plaintiff's alcohol and drug abuse on any physical or mental limitations.  <u>See</u> **<u>Brueggemann v. Barnhart</u>**, 348 F.3d 689, 693-94 (8th Cir. 2003) (discussing procedure to be followed when evaluating drug addiction or alcoholism and noting that a finding of disability precedes the application of the procedure).

Plaintiff contends, however, that the ALJ erred by not finding his mental impairments, i.e., depression, PTSD, and intellectual functioning, to be disabling.  Three GAFs were before the ALJ:  a February 2007 score of 50, a November 2007 score of 40,[18] and a February 2008

---

[18]The Commissioner argues that the score of 40 was not before the ALJ.  It was.  It was part of the medical records submitted to the ALJ, see transcript page at 396, and was submitted again to

score of 50. As noted by the Commissioner, a score of 50 reflects serious symptoms or serious impairment in social, occupation, *or* school functioning, not *and* as argued by Plaintiff. Nonetheless, the Eighth Circuit Court of Appeals in **Pate-Fires v. Astrue**, 564 F.3d 935, 944 (8th Cir. 2009), found that the ALJ had erred by not considering or discussing a claimant's history of GAF scores at 50 or below. In so holding, the court cited district court opinions holding that a score of 50 or below is generally inconsistent with an ability to work: Colon v. Barnhart, 424 F. Supp.2d 805, 812-13 (E.D. Pa. 2006); Golubchick v. Barnhart, No. CV-03-3362, 2004 WL 1790188, at *7 (E.D. N.Y. 2004); Mook v. Barnhart, No. 02-2347, 2004 WL 955327, at *6 (D. Kan. 2004). See also **Jaros v. Astrue**, No. 4:08cv1014 CAS (E.D. Mo. 2009) (remanding case for reconsideration of severity of mental impairments of claimant who had GAF scores of 50 and 40). And, in **Brueggemann**, 348 F.3d at 695, the court noted that a GAF score of 50 reflected "serious limitations in the patient's general ability to perform basic tasks of daily life" and that the VE in the case had considered a claimant with a GAF of 50 unable to find any work.

Because the ALJ failed to discuss or include in the hypothetical to the VE Plaintiff's GAF scores of 50 and 40, the case must be remanded.

Because the ALJ did not discuss the GAF scores, he did not determine whether those scores were influenced by drug or alcohol abuse. For instance, the GAF score of 40 was assessed on Plaintiff's admission to the emergency room after drinking and taking Vicodin.

---

the Appeals Council, see transcript page at 557. Indeed, the ALJ referenced Plaintiff's November 2007 trip to the emergency room, but did not mention the GAF score.

The ALJ also did not discuss the findings of Dr. Leonberger.  The Commissioner argues that Dr. Leonberger did not find, as argued by Plaintiff, that he had borderline intellectual functioning,[19] but found instead that he had an unspecified cognitive disorder and presented a complicated case, made more so by Plaintiff's lack of sleep the night before. Moreover, the job limitations of simple instructions and directions in a routine setting and with only occasional contact with the public and co-workers accommodate borderline intellectual functioning, if Plaintiff did have such.  In **England v. Astrue**, 490 F.3d 1017, 1023 (8th Cir. 2007), the court found that a hypothetical to a VE that included a need for direct supervision, routine interpersonal contact, and tasks requiring only simple judgment reflected the limitations of borderline intellectual functioning.  Although, as in **England**, the VE was not presented with the term "borderline intellectual functioning," he was presented with the resulting limitations.

Plaintiff's Credibility.  Plaintiff next argues that the ALJ erred when evaluating his credibility by giving too much weight to his limited daily activities and too little weight to the objective findings of the May 2008 MRI.  As noted by the Commissioner, the ALJ cannot be faulted for not considering a record not before him, e.g., the May 2008 MRI.

Plaintiff described his daily activities as including light chores, grocery shopping, and driving to visit his sister two or three times a week.  These activities do not support a finding that he "can perform full-time competitive work."  **Reed v. Barnhart**, 399 F.3d 917, 923-24

---

[19]The finding of borderline intellectual functioning is called into question by Plaintiff's passing a college entrance examination.

(8th Cir. 2005). In forms completed as part of the application process and in the medical records, Plaintiff described a more active life. He had friends he regularly visited. He went to flea markets and hunted for arrowheads. He anticipated returning to school or being retrained. He wanted to be a park ranger. He could walk a little over a mile, record at 516, and pay attention 90% of the time. He traveled to New York to visit a woman friend and stayed for at least one month.

The ALJ was not "obligated to accept all of [Plaintiff's] assertions concerning [his] limitations." **Ostronski v. Chater**, 94 F.3d 413, 418 (8th Cir. 1996). See also **Choate v. Barhnart**, 457 F.3d 865, 871 (8th Cir. 2006) (affirming ALJ's negative assessment of claimant's credibility; claimant's "self-reported limitations" on daily activities were inconsistent with medical record). Other descriptions in the record by Plaintiff of his activities were inconsistent with his hearing testimony. See **Halverson v. Astrue**, 600 F.3d 922, 932 (8th Cir. 2010) (affirming ALJ's adverse credibility determination in case in which ALJ may have overstated extent of claimant's daily activities but credibility assessment was supported by record and was proper).

Also detracting from Plaintiff's credibility are the lack of any restrictions placed on him by his treating physicians that reflect his self-described limitations. See **Mouser**, 545 F.3d at 638; **Roberson v. Astrue**, 481 F.3d 1020, 1025 (8th Cir. 2007). See also **Jones v. Callahan**, 122 F.3d 1148, 1152 (8th Cir. 1997) (subjective complaints of pain were properly discounted on grounds that, inter alia, they were inconsistent with absence of medically

ordered commensurate restrictions on claimant's activities). Dr. Shitut restricted him to driving a truck and not loading or unloading. Dr. Maitra's restrictions were consistent with Plaintiff's RFC. Additionally, Plaintiff did not participate, as directed by his treating physician, in physical therapy. "A failure to follow a recommended course of treatment . . . weighs against a claimant's credibility." **Guilliams v. Barnhart**, 393 F.3d 798, 802 (8th Cir. 2005); <u>accord</u> **Mouser**, 545 F.3d at 638.

<u>Hypothetical Questions to the VE.</u> "[T]estimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." **Porch v. Chater**, 115 F.3d 567, 572 (8th Cir. 1997). "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" **Guilliams**, 393 F.3d at 804 (quoting <u>Davis v. Apfel</u>, 239 F.3d 962, 966 (8th Cir. 2001)); <u>accord</u> **Goff v. Barnhart**, 421 F.3d 785, 794 (8th Cir. 2005); **Haggard v. Apfel**, 175 F.3d 591, 595 (8th Cir. 1999). Any alleged impairments properly rejected by an ALJ as untrue or unsubstantiated need not be included in a hypothetical question. **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001). As discussed above, however, if Plaintiff's GAF of 50 is valid, it must be included in a hypothetical question to the VE. <u>See</u> **Brueggemann**, 348 F.3d at 695 (VE considered score of 50 to reflect inability to work).

## Conclusion

Plaintiff might not be disabled within the meaning of the Act. The ALJ's failure to discuss Plaintiff's GAF scores requires a remand for further consideration of Plaintiff's mental impairments and, if necessary, the posing of additional hypothetical questions to the VE. Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be REVERSED and that this case be REMANDED for further proceedings as set forth above.

The parties are advised that they have **fourteen days from this date** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 15th day of June, 2010.